IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| GERALD ENGELHART and BARBARA ENGELHART, husband and wife,<br><br>Appellants,<br><br>v.<br><br>GERALDINE F. STRONG,<br><br>Respondent. | No. 55813-1-II<br><br>UNPUBLISHED OPINION |

MAXA, J. – Gerald and Barbara Engelhart (the Engelharts) appeal the trial court's allocation of proceeds from the sale of property in Olympia owned by Geraldine Strong following a bench trial. The trial court awarded Strong 65 percent and the Engelharts 35 percent of the proceeds.

In 2005, Strong jointly purchased the Olympia property with Lecia and Kelly Chacon (the Chacons), her daughter and son-in-law. Strong provided the funds to purchase the property and some of the funds for the Chacons to construct a house on the property, a total of over $441,000. They had plans to build two houses on the property; the Chacons would live in the first one and Strong would live in the second one.

In 2007, the Chacons obtained a loan from American General Home Equity Inc. (American General), which was secured by a deed of trust on the Olympia property, in order to complete construction of the first house. The Chacons also began to make payments to Strong in 2007, which eventually totaled $78,445.48.

In 2008, the Engelharts obtained a judgment for over $239,000 against the Chacons that was unrelated to Strong and the Olympia property. On the same day as the judgment, the Chacons executed a deed of trust on the property in the amount of $441,574, listing Strong as the beneficiary. A year later, Lecia Chacon executed a promissory note in which she promised to pay Strong $441,574. The Engelharts later filed a lawsuit in which the deed of trust was declared void.

In 2015, the Chacons quitclaimed their interest in the Olympia property to Strong. The Chacons subsequently defaulted on the American General loan, but the Engelharts cured the default by paying $85,000.

The Engelharts filed a lawsuit against Strong to determine the respective ownership interests of Strong and the Chacons in the Olympia property. The Engelharts could enforce their judgment lien only against the Chacons' interest. In 2019, pursuant to a stipulated order, Strong sold the property. The total net proceeds from the sale were $324,871.61, which was deposited with the court pending disbursement pursuant to the trial court's order.

The trial court determined that Strong and the Chacons were tenants in common regarding the Olympia property, each with a presumptive 50 percent interest. According to the court, the Chacons were expected to repay 50 percent of Strong's $441,000 contribution to the project and the $78,445.48 the Chacons paid was a partial repayment. Through this payment, the Chacons regained a 35 percent cotenant interest in the property. This calculation was the basis of the court's 65 percent allocation to Strong and 35 percent allocation to the Engelharts (for the Chacons' share).

The Engelharts argue that (1) Strong did not own the Olympia property as a tenant in common because the $441,000 Strong contributed was a loan to the Chacons and (2) the

2

Chacons had a 100 percent interest in the property and Strong was an unsecured creditor whose claim was subordinate to the Engelharts' recorded judgment. Therefore, they argue that the trial court erred in allocating any amount of the proceeds from the sale of the Olympia property to Strong. The Engelharts also argue that the $78,445.48 in payments that the Chacons made to Strong were voidable transfers under RCW 19.40.051. In the alternative, the Engelharts argue that they are entitled to recover from Strong a portion of the $85,000 they paid to cure the Chacons' default of their loan with American General because that payment unjustly enriched Strong.

We hold that (1) Strong and the Chacons owned the Olympia property as tenants in common, and the trial court did not err in allocating the sale proceeds between Strong and the Engelharts; (2) the statute of limitations barred most of the Engelharts' claim that the Chacons' $78,445.48 in payments to Strong were fraudulent transfers under RCW 19.40.051, and that the remainder of the claim fails on the merits; and (3) the Engelharts' cure of the American General default entitled them only to add the amount of the cure to their judgment against the Chacons, not to obtain that amount from Strong. Accordingly, we affirm the trial court's judgment.

FACTS

*Background*

Lecia and Kelly Chacon were married from 2005 to 2015. Strong was Lecia's mother, and she lived in California. In 2005, Strong and the Chacons agreed to purchase a parcel of property in Olympia. Their plan was to build two houses on the property, one for the Chacons and one for Strong so that Strong could move to Olympia and the Chacons could take care of her as she grew older.

Strong would be the initial source of the funds to purchase the property and build the houses. Strong and the Chacons anticipated that the Chacons would contribute their fair share of the cost of the project over time and that the Chacons would build the houses because Kelly worked in construction. Strong testified that Lecia[1] called her and said that "[t]hey would build a house for themselves, and then they'd build a house for me if I would buy the lot, and then they would get a loan later and pay their half." Report of Proceedings (RP) at 106.

*Property Purchase and House Construction*

In 2005, Strong and the Chacons purchased the Olympia property for a total of $185,000 plus closing costs, all of which came from a $200,000 loan Strong obtained. The statutory warranty deed transferred title to "Kelly Chacon and Lecia Chacon, husband and wife and Geraldine F. Strong, a single person." Clerk's Papers (CP) at 111.

Strong took out another loan for $225,000 to fund construction of the first house. Strong's total contribution regarding the property and the house was about $441,000.

In March 2007, the Chacons obtained a loan from American General in the amount of $135,583.21 in order to complete construction of the first house. The loan was secured by a deed of trust on the Olympia property.

Between 2007 and July 2018, the Chacons made payments to Strong totaling $78,445.48. These payments represented 35 percent of $220,500, half the amount Strong had contributed to the project.

---

[1] To avoid confusion, the Chacons will be referred to individually by their first names. No disrespect is intended.

*Judgment Lien and Deed of Trust/Promissory Note*

In March 2008, the Engelharts obtained a default judgment against the Chacons for $239,397.82. The judgment was related to business between the Chacons and the Engelharts and was unrelated to Strong and the Olympia property.

On the same day as the Engelharts' judgment, the Chacons executed a deed of trust on the Olympia property in the amount of $441,574 that listed Strong as the beneficiary. However, Lecia did not execute a promissory note to Strong until March 2009, a year later. The note reflected the same amount as in the deed of trust. The Engelharts challenged the validity of the deed of trust in a 2010 lawsuit against Strong and the Chacons. The trial court in that case found that Strong and the Chacons were tenants in common regarding the Olympia property and ruled that the deed of trust was void.

The Chacons lived for more than 10 years in the house they constructed on the Olympia property, but the Chacons never built the second house and Strong never lived on the property. In 2015, the Chacon's transferred their interest in the property to Strong through a quitclaim deed.

*Lawsuit and Complaint*

In September 2017, the Engelharts filed a complaint against Strong and the Chacons for a declaratory judgment and quiet title. They sought a declaration that Strong had no ownership interest in the Olympia property before receiving the quitclaim deed and that Strong's interest was subordinate to their judgment against the Chacons. In December 2018, the Engelharts filed an amended complaint that added an unjust enrichment claim relating to the $85,000 payment they made to cure the American General default. In October 2019, the Engelharts filed a second

amended complaint that added a fraudulent transfer claim regarding the $78,445.48 in payments that the Chacons made to Strong.

In 2019, Strong sold the Olympia property for $577,700 pursuant to a stipulated order. Along with other costs of sale, $222,298.78 was taken from the sale amount in order to satisfy the Chacons' loan with American General. The total net proceeds from the sale of the property were $324,871.61. This amount was deposited in the registry of the court to become available for disbursement upon the trial court's order.

*Bench Trial*

The trial court conducted a bench trial. Following the trial, the court entered findings of fact and conclusions of law. The findings of fact included the following:

> 1.4 In 2005 shortly after the Chacons' marriage, the defendant and the Chacons agreed to purchase a parcel of real estate in Olympia, Thurston County, Washington, which the Chacons, who were living in Olympia at the time, had located (herein "the property"). Their plan was to construct two homes on the property ("the project"), the first as a residence for the Chacons and the second as a residence for the defendant, who will be 89 years old this June. Their intention was that the defendant would move to "the property" in Olympia in order to be near her daughter and son-in-law so that they could assist in her care as she grew older.

CP at 110.

> 1.9 Of the $425,000.00 borrowed by the defendant on her California properties, at least $387,735.82 was used to purchase the land and for partial construction of the first home, the balance was used to service the defendant's loans to make that contribution. The defendant testified that her total contribution to the project was about $441,000.00. The Chacons were expected to repay the defendant 50% of contributions made to purchase and improve the property. The Chacons should have repaid Ms. Strong $220,500.00.

CP at 111.

> 1.11 In an effort to contribute their share toward the cost of "the project," between 2007 and July 6, 2018, the Chacons paid $78,445.48 to the defendant, of which $72,356.60 was applied by the defendant toward interest on her loans taken out to buy and improve "the property." Ms. Strong did not charge the Chacons interest on their share of the costs to purchase and improve the property. These payments,

made by the Chacons to Ms. Strong, are payments toward their co tenant property interests. The Chacons payments toward the cotenant interest constituted the Chacons contribution toward the acquisition and improvements of "the property" by partially reimbursing the defendant. The Chacons made payments totaling $78,445.48 to the defendant. These payments represent 35% equivalent of the $220,500.00 owed to Ms. Strong by the Chacons based on their unwritten agreements. The payments were in exchange for an increase in their cotenant interest and constitute reasonably equivalent value and not payment of an antecedent debt. Ms. Strong retained her 50% interest plus the 15% interest remaining unpaid by the Chacons as cotenants for a total of 65% property interest. The Chacons regained a 35% cotenant interest.

CP at 112.

1.13 Also on March 7, 2008, the Chacons executed a Deed of Trust on "the property" with the defendant as the beneficiary. A Promissory Note from the Chacons to the defendant for the amount reflected in the Deed of Trust was executed by Lecia Chacon on March 25, 2009. However, on October 13, 2010, the Deed of Trust was declared "void and of no force and effect" on the basis that the defendant was not a creditor but that she and the Chacons owned "the property" as tenants in common. (Thurston County Superior Court Cause No. 10-2-02270-5.) This had the effect of also voiding the Promissory Note that was an integral part of the "transaction" that was declared void.

CP at 112-13.

1.18 The relationship of the parties was as cotenants and not as debtor and creditor.

CP at 113.

The trial court concluded that Strong and the Chacons acquired the Olympia property as tenants in common and that each had a presumptive 50 percent ownership interest. As a result, Strong and the Chacons were cotenants, not creditor and debtors. The court ruled that because of their respective contributions, Strong had a 65 percent interest and the Chacons had a 35 percent interest in the property.

The trial court concluded that the $78,445.48 in payments that the Chacons made to Strong were not fraudulent transfers under RCW 19.40.051. In addition, the court ruled that (1) claims under RCW 19.40.051(1) for transfers made before October 11, 2015 and claims under

RCW 19.40.051(2) for all transfers were barred by the statute of limitations; and (2) all of the Engelharts' fraudulent transfer claims were barred by the doctrine of laches.

The trial court awarded Strong 65 percent of the funds in the registry of the court: $211,166.55. The trial court awarded the Engelharts 35 percent of the funds in the registry of the court: $113,705.06.

The Engelharts appeal the trial court's judgment.

ANALYSIS

A.    STANDARD OF REVIEW

We review a trial court's decision after a bench trial to determine whether the findings of fact are supported by substantial evidence and whether the conclusions of law are supported by the findings of fact. *Real Carriage Door Co., Inc. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied*, 198 Wn.2d 1025 (2021). Substantial evidence is the amount of evidence sufficient to convince a rational, fair-minded person that a premise is true. *Id.* All evidence and reasonable inferences are viewed in the light most favorable to the prevailing party. *Id.* Findings of fact that are unchallenged are treated as verities on appeal. *Id.*

When conclusions of law are mischaracterized as findings of fact, we analyze them as conclusions of law. *Id.* The trial court's application of facts to law and the conclusions of law are reviewed de novo. *Id.*

B.    CREATION OF TENANCY IN COMMON

The Engelharts' appeal primarily is based on the argument that Strong's $441,000 in payments constituted a loan to the Chacons, not the contribution of a tenant in common toward the purchase price. They claim that substantial evidence does not support the trial court's finding

that Strong and the Chacons were tenants in common rather than creditor and debtor. We disagree.

1. Legal Principles

When two or more people purchase property together, they are treated as tenants in common. *See Falaschi v. Yowell*, 24 Wn. App. 506, 508-09, 601 P.2d 989 (1979); *see also* RCW 64.28.020(1) (stating that with a few exceptions, "[e]very interest created in favor of two or more persons in their own right is an interest in common"). In a tenancy in common, "each cotenant is the holder of an undivided interest in the whole of the property." *In re Foreclosure of Liens*, 130 Wn.2d 142, 148, 922 P.2d 73 (1996). The interest of each cotenant is separate and distinct. *Id.*

There is a presumption that tenants in common share equally when the instrument by which the property was acquired is silent as to the cotenants' respective interests. *Cummings v. Anderson*, 94 Wn.2d 135, 140, 614 P.2d 1283 (1980). However, when the cotenants make unequal contributions to the purchase price, "a presumption arises that they intended to share the property proportionately to the purchase price." *Id.* This rule prevents a cotenant from taking an unfair advantage of another cotenant's investment. *Id.* at 142.

2. Tenant in Common vs. Lender

Here, Strong and the Chacons jointly purchased the Olympia property; the deed transferred title to both Strong and the Chacons. Therefore, they were tenants in common. *See Falaschi*, 24 Wn. App. at 508-09; RCW 64.28.020(1). The deed was silent regarding percentage of ownership, which normally would mean that Strong and the Chacons were equal owners. *See Cummings*, 94 Wn.2d at 140. But at least initially, Strong's payment of $441,000 was the only

contribution to the purchase price of the property and the house being built. Therefore, the presumption at the beginning was that she owned a 100 percent share of the property. *See id.*

Nevertheless, the Engelharts argue that Strong's payments constituted a loan to the Chacons, not the contribution of a tenant in common toward the purchase price. They point to evidence that in about 2007 Strong began to view the transaction as a loan once she realized that the second house would not be built. She also wrote a letter stating that the Chacons owed her $441,574. In addition, the Chacons executed a deed of trust in favor of Strong and Lecia later executed a promissory note, both in the amount of $441,574.

However, despite how the parties may have characterized the transaction later, substantial evidence shows that Strong's payments constituted an investment in the property rather than a loan when the property was purchased. Strong testified that she understood that when she bought the property, she "was sharing the property" with the Chacons and "was an owner with them." RP at 116. Lecia testified the intent was not that Strong would loan them money; "we were supposed to be in it together." RP at 218. She described the plan as "an investment deal that we were all going into." RP at 219.

The Engelharts suggest that somehow Strong's contributions were converted from an investment to a loan once the parties realized that a second house would not be built and Strong would not be able to live on the property. The promissory note reflected the Chacons' agreement to pay Strong the full amount of her contribution. But they ignore the fact that Strong still was a title owner of the property. And by operation of law, she had a significant ownership interest because she contributed the full purchase price of the property and much of the cost of the house. *See Cummings*, 94 Wn.2d at 140. Therefore, to the extent that the Chacons agreed to repay the full amount of Strong's contributions, substantial evidence supports the findings that repayment

could not be characterized as a repayment of a loan. The Chacons as tenants in common in fact would be "buying back" a proportionate share of the property ownership.

If the Chacons actually had paid Strong the full $441,000, they would have acquired a full ownership interest in the Olympia property because they now would have paid the full purchase price. *See id.* Because they ended up paying only $78,445.48, they reacquired a 35 percent ownership interest.

We reject the Engelharts' argument that substantial evidence did not support the trial court's finding that Strong's contributions to purchase the property and build the house did not constitute a loan. As a tenant in common and title owner of the property, those contributions reflected her proportionate share of ownership. To the extent the Chacons agreed to repay the full amount of those contributions, as tenants in common they would be increasing their proportionate ownership of the property.[2]

C.    CHALLENGED FINDINGS OF FACT

The Engelharts challenge several of the trial court's findings of fact. We conclude that substantial evidence supports these findings.

1.    Finding of Fact 1.4

The Engelharts challenge the sentence in finding of fact 1.4 stating that the plan of Strong and the Chacons was to build two houses on the property, one for the Chacons and one for Strong. We conclude that substantial evidence supports this finding.

---

[2] Strong argues that the Engelharts are judicially estopped from arguing in this appeal that she was a lender rather than a tenant in common because they argued in prior litigation regarding the deed of trust that Strong *was* a tenant in common. Because we conclude that the trial court did not err in finding that Strong and the Chacons were tenants in common, we do not address this argument.

Although Strong and the Chacons never had a written agreement, Strong, Lecia, and Kelly all testified that Lecia had called Strong with an opportunity to buy property on which the Chacons could build two houses. The plan was to build one house for the Chacons and a second house for Strong. Strong's health was deteriorating and this would allow for her to be close to the Chacons so that they could look after her.

The Engelharts argue only that this plan or agreement ended before they obtained the 2008 judgment. But the challenged sentence only addressed the original plan, not any future change in that plan. Therefore, we conclude that their challenge fails.

2.     Finding of Fact 1.9

The Engelharts challenge the following sentences in finding of fact 1.9: "The Chacons were expected to repay the defendant 50% of contributions made to purchase and improve the property. The Chacons should have repaid Ms. Strong $220,500.00." CP at 111. We conclude that substantial evidence supports this finding.

Strong testified that Lecia told her that "[t]hey would build a house for themselves, and then they'd build a house for me if I would buy the lot, and then they would get a loan later on and *pay their half*." RP at 106 (emphasis added). Strong understood that when she bought the property, she "was sharing the property" with the Chacons and "was an owner with them." RP at 116. Lecia testified the intent was not that Strong would loan them money; "[w]e were supposed to be in it together." RP at 218. She stated that Strong was going to get everything started, and then the Chacons were "supposed to eventually *pay for her part*." RP at 217-18 (emphasis added). Lecia described the plan as "an investment deal that we were all going into." RP at 219.

This evidence is sufficient to support the trial court's finding that the Chacons were expected to repay half of Strong's contribution to the property. And the Engelharts do not assign

12

error to the finding that Strong's total contribution was about $441,000. Half of that amount was $220,500, which is what the court found that the Chacons should have repaid Strong.

The Engelharts argue that the Chacons in fact owed Strong the full $441,000, not just $220,500. As noted above, they characterize Strong's payments as a loan that the Chacons had to pay back in full based on the testimony of Strong that her view of the transaction changed in 2007 and the execution of the deed of trust and promissory note.

It is clear from the record that sometime in 2007 Strong and the Chacons realized that the plan they made in 2005 was not going to be completed and that Strong would not be able to live on the property. Therefore, the Chacons would need to repay Strong the full amount she contributed to the property and house and the Chacons would become the sole owners.

However, this evidence must be evaluated based on the fact that in 2007 Strong was an owner – a tenant in common – of the property, not a lender. Regardless of how the parties subsequently viewed the transaction, Strong remained on the title to the property. And because she contributed the full purchase price of the property and much of the house, she had a significant ownership interest. *See Cummings*, 94 Wn.2d at 140. Therefore, to the extent that the Chacons agreed to repay the full amount of Strong's contributions, that repayment could not be characterized as a repayment of a loan. The Chacons as tenants in common in fact would be "buying back" a proportionate share of the property ownership.

In this context, the challenged portion of finding of fact 1.9 is not inaccurate even in light of later developments. The initial understanding was that the parties would share equally in the cost of the project, meaning that the Chacons would have to pay back half of Strong's contributions. The trial court's finding of fact reflected that understanding. The fact that the

13

Chacons later agreed to repay the full amount does not affect their obligation based on the initial understanding to pay half of that amount.

Therefore, we conclude that substantial evidence supports the challenged portion of finding of fact 1.9.

3.   Finding of Fact 1.11

The Engelharts challenge the trial court's findings in finding of fact 1.11 that the $78,445.48 the Chacons paid to Strong (1) was an effort to pay their share of the cost of the project, (2) was a payment toward their cotenant property interests and increased their interest, (3) constituted reasonably equivalent value and was not the payment of an antecedent debt, and (4) resulted in Strong having a 65 percent interest and the Chacons a 35 percent interest in the property. The Engelharts also challenge implied findings in finding of fact 1.11 that Strong and the Chacons were not creditor and debtor and that the $78,445.48 purchased an interest in the property. We conclude that substantial evidence supports these findings.

The Engelharts argue that the $78,445.48 payment was simply a loan payment, a payment on an existing debt. As noted above, at the time these payments were made, Strong and the Chacons were tenants in common regarding the property. Strong was an investor, not a lender. Because the parties were cotenants, any payment from the Chacons to Strong necessarily increased their interest in the property. And the trial court properly calculated that $78,445.48 was approximately 35 percent of a 50 percent share of Strong's contribution ($220,500), resulting in an ownership allocation of 65 percent to Strong and 35 percent to the Chacons.

We conclude that substantial evidence supports the challenged portion of finding of fact 1.11.

4.    Finding of Fact 1.13

The Engelharts challenge the trial court's findings in finding of fact 1.13 that (1) the deed of trust was voided in the earlier litigation based on a finding that Strong was a tenant in common and not a creditor, (2) the deed of trust was an integral part of the transaction between Strong and the Chacons, and (3) the judgment entered in the deed of trust litigation also voided the promissory note.

First, the Engelharts argue that the deed of trust was declared void in the 2010 lawsuit because the promissory note did not exist at the time it was executed, not because Strong was a tenant in common rather than a creditor.  However, the court made a finding of fact that Strong and the Chacons were tenants in common and made no finding of fact regarding the absence of a promissory note.  Therefore, the trial court reasonably could infer that the deed of trust was voided based on the fact that Strong was a tenant in common.  We hold that substantial evidence supports this part of finding of fact 1.13.

Second, the Engelharts assign error to the finding that the deed of trust was an integral part of the transaction between Strong and the Chacons.  However, finding of fact 1.13 states that the *promissory note* was an integral part of the transaction, not the deed of trust.  Because the Engelharts fail to address the actual finding, we decline under RAP 10.3(a)(4) to address this assignment of error.

Third, the Engelharts argue that the promissory note was not void merely because the deed of trust was declared void.[3]  We agree.  A deed of trust secures a promissory note or other obligation, *see* RCW 61.24.030(7)(a), and creates the roles of lender, borrower, and trustee.

---

[3] The trial court's "finding" on this issue actually is a conclusion of law, so we review it de novo. *See Real Carriage Door*, 17 Wn. App. 2d at 457.

*Terhune v. N. Cascade Tr. Servs., Inc.*, 9 Wn. App. 2d 708, 717, 446 P.3d 683 (2019). But a promissory note is a separate obligation from the deed of trust. *Boeing Emps.' Credit Union v. Burns*, 167 Wn. App. 265, 272, 272 P.3d 908 (2012). There is no basis for concluding that the promissory note was void simply because the deed of trust was void.

However, as discussed above, the fact that Lecia executed a promissory note did not change the fact that Strong and the Chacons were tenants in common. The promissory note could not convert Strong's contributions to purchase the property and build the house into a loan. Therefore, we hold that the trial court's error in concluding that the void deed of trust also voided the promissory note was harmless because it does not materially affect the judgment. *See Lavington v. Hillier*, 22 Wn. App. 2d 134, 148, 510 P.3d 373, *review denied*, 200 Wn.2d 1010(2022).

D.     FRAUDULENT TRANSFER CLAIM

The Engelharts argue that the Chacons' $78,445.48 in payments to Strong constituted fraudulent transfers under the Fraudulent Transfer Act, former chapter 19.40 RCW (1987),[4] because the Chacons did not receive reasonable value for the payments and because the payments were to an "insider" for an antecedent debt. Strong argues, and the trial court ruled, that the Engelharts' fraudulent transfer claims are barred under the applicable statute of limitations and laches and that the payments were not fraudulent transfers. We agree with Strong.

1.     Legal Principles

Former RCW 19.40.051(a) states as follows:

---

[4] In 2017, this statute was renamed the Uniform Voidable Transactions Act, RCW 19.40.900, and minor amendments were made to the statutory provisions.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value in exchange for the transfer or obligation* and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(Emphasis added).

Former RCW 19.40.051(b) also states:

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was *made to an insider for an antecedent debt*, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

(Emphasis added.)  An "insider" includes a relative of the debtor.  Former RCW

19.40.011(7)(i)(A).

2.    Statute of Limitations

The trial court ruled that the statute of limitations barred any claims under former RCW

19.40.051(a) before October 2015 and all claims under former RCW 19.40.051(b).  We agree.

A claim under former RCW 19.40.051(a) cannot be brought "later than four years after

the transfer was made or the obligation was incurred."  Former RCW 19.40.091(b).  A claim

under RCW 19.40.051(b) cannot be brought "later than one year after the transfer was made."

Former RCW 19.40.091(c).

The Chacons' first payment to Strong was made in 2007 and their last payment was made

on July 6, 2018.  The Engelharts argue that the statute of limitations was tolled when they filed

their complaint in September 2017.  However, they did not assert their fraudulent transfer claim

17

until they filed their second amended complaint in October 2019. Therefore, that is the date for application of the statute of limitations.[5]

Based on the October 2019 second amended complaint, we conclude that the Engelharts' former RCW 19.40.051(a) claim is barred for any payments before October 2015 and their former RCW 19.40.051(b) claim is completely barred.

### 3. Fraudulent Transfer Analysis

A few of the Chacons' payments occurred less than four years before the Engelharts amended their complaint to add a fraudulent transfer claim. Under former RCW 19.40.051(a), a transfer is fraudulent if the transferee is insolvent and did not receive "a reasonably equivalent value in exchange for the transfer." The trial court ruled that the Chacons' payments to Strong did involve the exchange of reasonably equivalent value. We agree.

As discussed above, because the parties were tenants in common, any payment from the Chacons to Strong necessarily increased their interest in the property. Therefore, the Chacons received equivalent value for their payments: an increase in their ownership percentage in the Olympia property.

We conclude that the Chacons' payments to Strong were not fraudulent transfers under former RCW 19.40.051(a).

### E. CURE OF AMERICAN GENERAL LOAN

The Engelharts argue that they are entitled to recover from Strong a proportionate amount of their payment to cure the default on the American General loan under an unjust enrichment

---

[5] The Engelharts do not argue that the second amended complaint relates back to the first complaint filed in September 2017 under CR 15(c). Therefore, this court need not address this issue.

theory. Strong argues that unjust enrichment is unavailable because a statute allows the

Engelharts to add the amount of the cure to their judgment lien. We agree with Strong.

1. Legal Principles

An unjust enrichment claim has three elements: " '(1) the defendant receives a benefit,

(2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for

the defendant to retain the benefit without payment.' " *Lavington*, 22 Wn. App. 2d at 144

(quoting *Young v. Young*, 164 Wn.2d 477, 484-85, 191 P.3d 1258 (2008)).

However, enrichment alone is not enough – it is essential that the enrichment be unjust

both under the circumstances and as between the parties to the transaction. *Norcon Builders LLC*

*v. GMP Homes VG LLC*, 161 Wn. App. 474, 490, 254 P.3d 835 (2011). The mere fact that the

defendant has benefitted from the plaintiff does not justify recovery. *Id.* Unjust enrichment

applies only if the circumstances make it unjust for the defendant to keep the benefit without

compensation. *Id.*

In addition, unjust enrichment is an equitable claim. *Columbia Cmty. Bank v. Newman*

*Park LLC*, 177 Wn.2d 566, 574, 304 P.3d 472 (2013). The general rule is that courts will not

provide an equitable remedy if the claimant has an adequate remedy at law. *Columbia State*

*Bank v. Invicta Law Grp. PLLC*, 199 Wn. App. 306, 316, 402 P.3d 330 (2017).

2. Analysis

Here, the Engelharts have a statutory remedy for their payment to cure the American

General loan default. RCW 61.24.090(1) entitles any person with a subordinate lien on a trust

property to discontinue sale proceedings by curing the default. The statute further provides,

> Any person having a subordinate lien of record on the trust property and who has
> cured the default or defaults pursuant to this section *shall thereafter have included*
> *in his lien all payments made to cure any defaults*, including interest thereon at
> eight percent per annum, payments made for trustees' costs and fees incurred as

authorized, and reasonable attorney's fees and costs incurred resulting from any judicial action commenced to enforce his or her rights to advances under this section.

RCW 61.24.090(5) (emphasis added).

Under RCW 61.24.090(5), the payment that the Engelharts made to cure the Chacons' default of their American General loan may be included in their judgment against the Chacons. Because the legislature has provided a remedy at law for the Engelharts' payment, we decline to apply the equitable remedy of unjust enrichment.

CONCLUSION

We affirm the trial court's judgment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
CRUSER, A.C.J.

_____
VELJACIC, J.